**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 01-50486
_____

ADRIAN KEITH GORDON, Individually and as next friend of KEITH
CHANCE GORDON, a minor,

Plaintiff-Appellee,

versus

RUDY ORTIZ, SHAWNENE SCHAWVER, DAVID DOUGLAS, RONALD SANCHEZ, JOE
PAEZ, ELISEO PEREZ, DARREN WESTFALL, and JOHN ERIC RUTHERFORD, in
their individual capacities.

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas, San Antonio Division
(00-CA-0049-EP)
_____
July 1, 2002

Before WIENER and DENNIS, Circuit Judges, and DUPLANTIER,[*] District
Judge.

PER CURIAM[**]:

Defendants-Appellants, several law enforcement officers

involved in the allegedly unconstitutional restraint, search, and

---

[*] The Honorable Adrian G. Duplantier, United States District
Court Judge for the Eastern District of Louisiana, sitting by
designation.

[**] Pursuant to 5TH Cir. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH Cir. R. 47.5.4.

arrest of Plaintiffs-Appellees Adrian and Keith Gordon, father and son, appeal the district court's order denying their motions for summary judgment based on qualified immunity. Agreeing with the district court's ruling in regard to all the appellants other than Shawvene Schawver, we reverse as to her and affirm as to all the rest.

## I.   FACTS AND PROCEEDINGS

This case involves 42 U.S.C. §§ 1983 and 1985-86 claims, as well as several state law tort claims, grounded in the defendants' allegedly unconstitutional stop, restraint, search, seizure, arrest, and malicious prosecution of the plaintiffs — a father and his teen-aged son — triggered by the broadcast of a call by Schawver, a police radio-dispatcher, in response to a cautionary report that she received from a Texas state trooper. Four days prior to the dispatcher's call and the ensuing incident involving the Gordons, a black male named James Engleton had killed three police officers in a gun battle in Atacosta County, Texas, in which Engleton too was killed. Apparently, a brother of Engleton had attempted to get to the crime scene that day but was forced to leave the area by law enforcement personnel after he created a disturbance.[1] The funeral for two of the slain officers took place four days later in Atacosta County.

---

[1] The record indicates that Engleton's brother(s) (the record is also unclear whether Engleton had one brother or more) may have had a known prior criminal history.

On the day of the funerals, plaintiffs —— Adrian and Kieth Gordon (father and minor son, respectively) —— both of whom are black males, were traveling from their home in San Antonio to a fishing and hunting destination in Port Mansfield, a distance of more than 200 miles. On the morning in question, the Gordons happened to stop for breakfast at the Taco Palacios restaurant in Pleasanton, a town in Atacosta County near the site where the funerals for two slain officers were taking place.

About mid-morning, defendant-appellant Schawver received a call from a Texas state trooper, relaying information that he had just received from an unidentified woman who purportedly had been at the Taco Palacios:

> Trooper: Atacosta, I had a subject [the unidentified woman] come up to me just a little bit ago here at the Exxon station across from the funeral home. She advised that —— that Engleton subject's brother was over there; stating he was bragging about what had happened and saying that the guy was talking about himself, saying he was on some kind of mind buzz or something over there. I don't know if you might want to have somebody keep an eye on him or something.

In turn, Schawver broadcast information over the dispatch radio:

> Dispatcher [Schawver]: Okay. Attention all units: All officers, all units in the area of Pleasanton, I need you to be on the lookout for Engleton subject —— well, the brother —— has [sic] been advised that he is probably in the Pleasanton area at this time with another African-American man. Possible description is a small gray Toyota station wagon. This is unconfirmed. But that a citizen is claiming that they were over at Taco Palacio in Pleasanton. All units, all officers, if you would, be alert and use extreme caution at this point in time. Time now 11:02.

Two of the defendants, county deputies Rudy Ortiz and David

3

Douglas, immediately responded to the call and were the first officers to reach the restaurant. When they arrived, they saw two black males driving away from the parking lot in a blue Ford pickup truck. Officer Ortiz activated his police lights, stepped out of his vehicle, identified himself, and told the driver of the pickup to stop the truck, step out, and walk toward the police car with his hands on the truck. Cooperating willingly and doing as he was told, the driver left his door open and approached the police car precisely as directed. Officer Ortiz then moved towards the driver and handcuffed him. Meanwhile, Officer Douglas walked to the right side of the vehicle, handcuffed the passenger, and placed him face-down on the hood of the pickup, the engine of which was still running. At this point, between ten and fifteen law enforcement personnel including the other defendants in this case (other than Schawver) — namely Deputies Ronald Sanchez, Joe Paez, and Eliseo Perez, Lieutenant John Rutherford, as well as Darren Westfall, an investigator for the Atascosta County District Attorney's office — arrived at the parking lot.

Brandishing his shotgun, newly-arrived Deputy Sanchez approached the handcuffed driver Adrian Gordon and frisked him for weapons while Officer Ortiz, having obtained Gordon's driver's license and identification, proceeded with a license check. The driver's identification and Officer Ortiz's license check confirmed that the driver was Adrian Gordon from San Antonio, Texas, and not an Engleton. Meanwhile, Investigator Westfall had arrived on the

4

scene and proceeded to question the pickup truck's teenage passenger, Keith Gordon. The minor indicated that his identification was in a bag inside the cab of the truck. Westfall entered the vehicle and located the teenager's identification, which confirmed that he was Keith Gordon.[2]

After the Gordons' identities were confirmed, the defendant law enforcement personnel nevertheless continued to investigate, while the Gordons remained handcuffed and restrained. The record confirms that the Gordons cooperated with the officers and answered their questions promptly, courteously, and truthfully.

As the questioning proceeded, defendant Joe Paez, a reserve police officer from the Jourdanton Police Department, approached Officer Ortiz holding an expandable baton (apparently one easily identified as an "asp" or weapon-type baton) which he had taken from the vehicle. Officer Paez claims that he saw the baton in "plain view" as it lay at the bottom of a pouch on the inside panel of the driver's-side door, which had remained open ever since the pickup was stopped.[3]

---

[2] The Gordons contend that, despite having been told of the exact location of the bag, Westfall nevertheless conducted an unconsented search of the entire portion of the vehicle he entered.

[3] As will be discussed further below, the Gordons, in their deposition testimony, vigorously dispute that the baton was in "plain view," arguing that — as Paez stated — the baton was at the bottom of the door pouch, but that it was covered by many other articles which precluded it from being observed by anyone without a search, i.e., it was not in plain view. In addition, Officer Perez's version of the sighting of the baton differed with Officer Paez's version: Officer Perez described the baton as partially

5

At about the same time that the baton was discovered and seized,[4] the officers initiated a full search of the Gordons' truck. During this search, the officers found, <u>inter alia</u>, an unloaded handgun inside a toolbox in the back seat of the truck.[5] In the bed of the truck, the officers found an ice chest on which the name "Cliff Tudyk" was written. Coincidentally, the last name of one of the slain officers was Tudyk, although his first name was not Cliff.

After the discovery of the baton and handgun, Officer Sanchez asked the father, Adrian Gordon, if he had a permit to carry a concealed weapon. Adrian Gordon replied that he had no such permit, adding that he was not "carrying" a concealed weapon; rather, the pistol was inside the tool box which was on the rear seat, neither on his person nor easily accessible. Adrian Gordon explained further that he was "traveling" and was therefore exempt from the charge of carrying a concealed weapon without a permit, as prohibited by Texas Penal Code § 46.02.[6]

---

protruding from the pouch, at an angle.

[4] The record is vague and contains contradictory assertions as to the exact sequence of events during the stop. It is unclear whether the full search of the vehicle producing the handgun (see <u>infra</u> n. 5 and accompanying text) occurred after, or contemporaneously with, the discovery of the baton.

[5] The magazine for the gun, containing live rounds, was found in the tool box, next to the gun.

[6] Texas Penal Code § 46.02 provides in relevant part: (a) A person commits an offense if he intentionally, knowingly, or recklessly <u>carries on or about his person</u>

Officer Ortiz then asked Adrian Gordon the purpose of his trip, to which he replied that he was on a hunting and fishing trip with his son. He then showed Officer Ortiz his valid fishing and hunting licenses.[7] When asked where he got the ice chest with the name "Cliff Tudyk" written on it, Adrian Gordon replied (truthfully) that it belonged to one of his employees.

John Rutherford, the ranking officer on the scene, then approved the reading of Miranda rights to Adrian Gordon. He was then taken into police custody and transported to the Atacosta County Jail on charges of carrying a concealed weapon without a permit. The investigating officer at the jail interviewed Adrian Gordon briefly and determined that the concealed weapon statute did not apply to him because, inter alia, Adrian Gordon was a bona fide traveler. The investigator's deposition testimony reveals that he immediately relayed this recommendation to Rutherford and the

---

a handgun, illegal knife, or club.
(b) It is a defense to prosecution under this section that the actor was, at the time of the commission of the offense
...
    (3) traveling;
...    (emphasis added).

[7] Apparently, one of the Gordons answered that they were going hunting while the other answered that they were going fishing. The appellants argue that this equivocation, coupled with the lack of sporting equipment in the truck, indicated suspicious behavior on the part of the Gordons. The Gordons' deposition testimony indicates they embarked with the intention of going fishing and, circumstances permitting, hunting as well, and that their sporting equipment was stored at a hunting and fishing location in Ports Mansfield.

county attorney. Even though the charges against the elder Gordon were eventually dismissed, he spent some four to six hours in jail, and missed out on the pleasure trip with his son. Keith, the younger Gordon, was never charged with any crime, but was nevertheless transported in handcuffs to the Pleasanton Police Department where he was later released to his grandfather's custody.

The Gordons filed suit in district court asserting both state and federal claims against the defendants. These claims were grounded in the Gordons' contention that they were stopped, restrained, searched, and arrested without probable cause, solely because they are African-American males. Specifically, against the cities of Pleasanton and Jourdonton, the County of Atacosta,[8] Officers Ortiz, Douglas, Sanchez, Rutherford, Paez, Perez, Dispatcher Schawver, and Investigator Westfall, the Gordons alleged causes of action under § 1983 for (1) violation of their right to be free from punishment for exercise of free speech, (2) unreasonable arrest, search, and seizure, (3) arrest without probable cause, (4) search and arrest without warrant, (5) use of excessive force, (5) malicious prosecution, (6) equal protection violations, and (6) libel, slander, and defamation. The Gordons also asserted causes of action under §§ 1985 and 1986 for

_____

[8] The municipal defendants are not included in this appeal because they are not eligible for qualified immunity. See Turner v. Houma Mun. Fire and Police Service Bd., 229 F.3d 478, 483 (5th Cir. 2000).

conspiracy to deprive them of equal protection under color of law and negligence in the prevention of wrongful conduct under color of law. Finally, the Gordons advanced supplementary state law claims against the individual defendants for false arrest, false imprisonment, assault and battery, libel, slander, intentional infliction of emotional distress, and malicious prosecution.

Soon after receiving the complaint, and within the time period specified by Western District of Texas Local Rule CV-12, Officer Perez and Dispatcher Schawver filed —— and the district court denied —— a joint Rule 12(b)(6) motion to dismiss the claims against them based on their entitlement to qualified immunity.[9] The other defendants did not, at that time, submit either Rule 12(b)(6) or summary judgment motions based on federal qualified immunity. In fact, it was not until more than a year after the original complaint was filed, and after all discovery was

---

[9] Local Rule CV-12 states:
In any case filed pursuant to 42 U.S.C. § 1983, or involving causes of action in which the defense of qualified or Eleventh Amendment immunity may be asserted, the party of parties asserting the defense shall file a motion to dismiss or for summary judgment in their initial pleading or within thirty calendar days of their initial pleading, or, if asserted in response to allegations made by amended complaint, within twenty days of the date the amended complaint was filed. When a party files a motion to dismiss or for summary judgment based on qualified or Eleventh Amendment immunity, the opposing party shall have eleven days from the date the motion is served on the opposing party to file a response to specify what, if any, discovery is necessary to determine the issue(s) of qualified or Eleventh amendment immunity and the time period necessary for the specific discovery. (emphasis added).

completed, that the rest of the defendants (hereafer collectively, the "waiver defendants") filed motions for summary judgment based on qualified immunity.

The district court ruled that because all the defendants (other than Schawver and Perez) had failed to comply with Local Rule CV-12's timeliness requirement, they had waived their right to move for summary judgment based on qualified immunity. Nevertheless, the district court proceeded in the alternative to analyze the merits of the qualified immunity claims under the relevant legal test and found, for the most part, that the defendants' actions were not objectively reasonable. As the district court concluded that the Gordons could not allege sufficient facts to state legally cognizable § 1983 or state law claims for defamation, libel, and slander, however, it granted summary judgment as to all defendants on these claims. Also, as to defendants Schawver (the dispatcher), Perez, and Westfall, the court granted summary judgment on the Gordons' malicious prosecution claims (both federal and state); and as to defendant Schawver, the court granted summary judgment on the Gordons' excessive force claim (both federal and state). In all other respects and on all other claims, the court denied summary judgment based on qualified immunity.

The waiver defendants then moved for reconsideration, urging, inter alia, that they had not waived their qualified immunity defenses by failing to comply with Local Rule CV-12. Noting that

10

it had also ruled that the defendants' actions were objectively unreasonable, the court denied the motions for reconsideration. The police officers, dispatcher Schawver, and investigator Westfall timely filed interlocutory appeals.  To the extent that the district court ruled in the defendants' favor by dismissing some of the claims, the Gordons have not cross-appealed.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's denial of summary judgment de novo, applying the same standard as the district court.[10]  To determine whether a defendant is shielded by qualified immunity, we engage a two-part inquiry: (1) whether the plaintiff alleged a violation of a clearly established constitutional right; and if so, (2) whether the defendants' conduct was ctively reasonable.[11]

We have no jurisdiction to review interlocutory appeals from the denial of summary judgment based on qualified immunity when the appeal challenges the district court's ruling that genuine issues exist concerning material facts.[12]  We retain jurisdiction over appeals that challenge questions of law, such as the materiality of

---

[10]  Fed. R. Civ. P. 56(c); Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

[11]  Siegert v. Gilley, 500 U.S. 226, 231-32 (1991).

[12]  See Jones v. Collins, 132 F.3d 1048, 1051-52 (5th Cir. 1998)

11

the factual issues.[13]  The determination whether a defendant's conduct was objectively reasonable is a question of law,[14] but that question of law can only be reviewed when there are no underlying genuine disputes of fact.

## B.  **Waiver of Qualified Immunity**

The Gordons urge affirmance of the district court's ruling that the waiver defendants waived their right to seek summary judgment on the basis of qualified immunity.  Echoing the district court's reasoning, the Gordons' assertion cited the waiver defendants' failure to comply with iling requirements of Local Rule CV-12 of the Western District of Texas.[15]

The Gordons filed their original complaint in this matter on January 14, 2000, and summons were issued forthwith to Dispatcher Schawver, and Officers Ortiz, Douglas, Sanchez, Perez, and Paez. Initially, Perez and Schawver submitted a joint answer asserting a defense of qualified immunity; but, within the thirty-day period

---

[13]  Bazan v. Hidalgo County, 246 F.3d 481, 490 (5th Cir. 2001): The controlling jurisdictional rule for this interlocutory appeal comports with this: 'A denial of [a motion for summary judgment based on] qualified immunity is immediately appealable under the collateral order doctrine, when based on an issue of law.'.... Accordingly, we have jurisdiction for this interlocutory appeal if it challenges the materiality of factual issues, but lack jurisdiction if it challenges the district court's genuineness ruling — that genuine issues exist concerning material facts.  (emphasis in original) (citations omitted).

[14]  Id.

[15] See supra note 9 for text of rule.

12

prescribed by Rule CV-12, those two filed a joint motion to dismiss the claims against them based on qualified immunity, which motion was denied by the court. Their denied dismissal motion, which was noticed to and served on the lawyers for the four waiver defendants (co-defendants Ortiz, Douglas, Sanchez, and Paez[16]) expressly stated that this motion was submitted to comply with the temporal requirements of Local Rule CV-12.

Puzzlingly, defendants Ortiz, Douglas, and Sanchez also submitted an Original Answer, asserting a qualified immunity defense, and on the same day, filed a Rule 12(b)(6) motion for dismissal. Significantly, however, their dismissal motion was based not on a federal qualified immunity defense, but on the assertion that Texas Torts Claims Act and "derivative immunity" under Texas state law barred plaintiffs' claims. Correctly finding those arguments legally irrelevant and inapplicable, the district court denied the motion.

Waiver defendants Westfall and Rutherford (like Ortiz, Douglas, Paez, and Sanchez) failed to file motions for dismissal or summary judgment on qualified immunity grounds within the time prescribed by CV-12, although it appears that eventually they too "asserted" qualified immunity or some form of official immunity in

---

[16]   The other individual defendants in this appeal, Officers Rutherford and Investigator Westfall, were added as defendants in the Gordons' subsequent amended complaints, so they were not subject to the same time line for filing as Ortiz, Douglas, Paez, and Sanchez.

13

their answers to the Gordons' amended complaints. Still, their pleadings alone are not sufficient to comply with the plain language of CV-12, which unequivocally requires (1) the filing of a motion (2) for qualified immunity dismissal, (3) within a specified time.[17] On appeal, the six waiver defendants argue that (1) their "assertions" of qualified immunity in their answers gave notice to the Gordons that they would be defending on qualified immunity grounds, (2) the Gordons were not prejudiced by their non-compliance with CV-12, and (3) moving for dismissal or summary judgment would have been a meaningless gesture because the court had already denied Perez and Schawver's motion for dismissal.

We are unpersuaded by the waiver defendants' arguments. First, although it is true that their qualified immunity assertions in their respective answers probably amounted to actual notice that eventually they would move for judgment on those grounds, the plain language of CV-12 required them to submit a motion rather than informally provide actual notice. Their co-defendants, Perez and Schawver, complied with the rule by asserting qualified immunity in

---

[17] Officers Ortiz, Douglas, and Sanchez filed their original answer on February 28, 2000; Officer Paez filed his amended answer on June 20, 2000; Officer Rutherford filed his original answer on June 22, 2000; Investigator Westfall filed his answer ro the Gordons' second amended complaint on November 13, 2000. The first motion for dismissal based on qualified immunity submitted by all six of these defendants (Ortiz, Douglas, Sanchez, Rutherford, Paez, and Westfall) was filed on February 16, 2001, well in excess of the period mandated by Local Rule CV-12, which specifies that the motion must be filed in the defendant's initial pleading or within thirty days of that initial pleading.

their answer and then timely filing a motion for dismissal on those grounds. If nothing else, this conduct, of which the waiver defendants received notice, should have prompted them to do likewise.

We are aware that at least one district court case supports the proposition that failure to comply with Local Rule CV-12 will not, in every case, automatically constitute waiver of the right to assert the qualified immunity defense at the summary judgment stage. In an unpublished opinion for <u>Chacon v. Housing Authority of El Paso</u>,[18] the Western District of Texas rejected the plaintiff's claim that the defendant had procedurally waived his qualified immunity defense by failing to comply timely with CV-12.[19] In addition to noting the lack of precedential support for that plaintiff's waiver argument, the Western District also noted that (1) "various procedural hurdles not entirely outside of Plaintiff's control weigh against any waiver" and (2) the plaintiff had not contended or demonstrated any prejudice from the delay. Here, the

---

[18]   2000 WL 33348200 (W.D. Tex. 2000) (unpublished).

[19]   <u>Id.</u>:
Although the immunity determination should be made "at the earliest possible state of a litigation," <u>Martin</u> simply does not support Plaintiff's contention that Alvarado's noncompliance with Local Rule CV-12 should constitute waiver, abrogating the important policy underlying the immunity, namely protecting the public by permitting its decision-makers to act without fear of unanticipated personal liability. (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 646 n.6 (1987) and citing <u>Martin v. Thomas</u>, 973 F.2d 449, 458-59 (5th Cir. 1992).

15

Gordons did nothing to prevent, hamper, or otherwise complicate the defendants' ability to comply with CV-12. Furthermore, as discussed more fully below, the Gordons can demonstrate that they would suffer prejudice from the defendants' non-compliance if it were disregarded.

Contrary to Chacon, a recently published case from the Eastern District of Texas, Hucker v. Beaumont, supports the general proposition that a defendant may be procedurally barred from asserting a qualified immunity defense as a basis for dismissal before trial.[20] In Hucker, the defendant police officer failed to file a timely responsive pleading to the plaintiff's complaint as required by Fed. R. Civ. P. 12(b). Instead, after the responsive pleading deadline had passed, the defendant submitted a motion for summary judgment based on qualified immunity. As the defendant completely missed the Rule 12(b) deadline, the court ruled that he had waived the right to assert a qualified immunity defense at that stage of the litigation.[21]

To repeat, the Gordons present a viable argument that they would be prejudiced if CV-12 were disregarded for purposes of waiver. Some of the waiver defendants submitted their summary judgment motions more than a year after they were required to by

---

[20] Hucker v. Beaumont, 144 F.Supp. 2d 696 (2001).

[21] Id. at 702 ("Although the City of Beaumont defendants subsequently entered an Amended Motion for Summary Judgment ... this Court holds that Officer Jagneaux is barred from asserting the defense of qualified immunity under 12(b).")

16

Rule CV-12. In the interim, the Gordons had completed all discovery — which in this case involved numerous interrogatories and depositions regarding a multitude of claims — and were ready for trial. Rule CV-12 contemplates a timely qualified immunity motion as an aid in determining the necessity and scope of discovery, not as a post-discovery tool.[22] The Gordons insist that if the waiver defendants had timely filed motions for dismissal based on qualified immunity, then they (the Gordons) either (1) would not have had to conduct extensive discovery, or (2) would have narrowly focused their discovery on overcoming that defense. Also, a timely consideration of the qualified immunity question might have eliminated some of the Gordons' constitutional claims, thereby minimizing the scope and cost of their discovery and trial preparation. Now, after having incurred significant expenditures of time and money in preparing for trial, the Gordons would suffer prejudice if the district court were to disregard Rule CV-12 and consider the waiver defendants' qualified immunity defenses.

The waiver defendants' third and final argument — that the district court's ruling on Perez's and Schawver's motion rendered any motions by other the defendants meaningless — is nothing more than a transparent, post-hoc rationalization for having missed the

---

[22] Local Rule CV-12 (in relevant part, "[w]hen a party files a motion to dismiss or for summary judgment based on [qualified immunity], the opposing party shall have eleven days ... to file a response and to specify what, if any, discovery is necessary to determine the issue(s) of [qualified immunity] and the time period necessary for the specific discovery.").

CV-12 deadline. Defendants Ortiz, Douglas, and Sanchez filed their joint Original Answer on February 28, 2000; Perez and Schawver did not submit their Rule CV-12 motion to dismiss based on qualified immunity until March 9, 2000; and the court ruled on it on March 30. Pursuant to CV-12, the deadline for Ortiz, Douglas, and Sanchez to have filed a qualified immunity dismissal motion had already passed by the time the court ruled on Perez and Schawver's motion. Therefore, these waiver defendants cannot now assert that their failure to file a motion in compliance with Local Rule CV-12 was premised on their reliance on the district court's adverse ruling on their co-defendants' motion.

In sum, the waiver defendants' failure to comply with the plain language and time requirements of Local Rule CV-12, combined with the facts that (1) the Gordons did not facilitate or otherwise cause the non-compliance, (2) the waiver defendants were alerted to the requirements of CV-12 by receiving copies of their co-defendants' motion, and (3) the Gordons could suffer prejudice, justifies the district court's ruling that those defendants waived their right to move for summary judgment based on qualified immunity at this stage of the litigation. In affirming the district court's ruling that defendants Ortiz, Douglas, Paez, Sanchez, Rutherford, and Westfall waived their right to move for qualified immunity, we do not completely bar them from asserting the defense; they may still assert it as an affirmative defense at trial.

18

**C.    Merits of Qualified Immunity Defense**

As only Schawver and Perez properly and timely moved for summary judgment based on qualified immunity in compliance with Local Rule CV-12, we now address the merits of their defenses.

**1.    Dispatcher Schawver**

The district court, concluding that Schawver's actions were objectively unreasonable under clearly established law, denied qualified immunity against the Gordons' claims for violation of their rights to free speech and to be free from unreasonable searches, seizures, and arrests.    Our review of the record convinces us that Schawver is entitled to qualified immunity.

As detailed above in the Facts and Proceedings section of this opinion, Schawver's involvement in this case is limited to the dispatch call that she broadcasted to all officers (and which was received by those who eventually stopped, searched, and arrested the Gordons) but to none specifically.    In making the dispatch call, Schawver did nothing more than rephrase and repeat the information that she had received from the Texas state trooper who had called her regarding the possibility of trouble involving Engleton's surviving brother(s).    Schawver's admonition to use caution was reasonable in light of the reported appearance by the brother(s) near the crime scene and funerals, and of his (their) possible past criminal history.    Schawver did not relate any facts that she knew or should have known were untrue, did not exacerbate the situations by using inflammatory rhetoric, and did not state or

19

suggest that the suspects had committed or were in the process of committing a crime. Rather, consistent with the essentially non-discretionary duties of such dispatchers, she merely relayed the trooper's information. Under these circumstances, her dispatch call was objectively reasonable, entitling her to qualified immunity.

## 2. **Officer Perez**

On an interlocutory appeal of an order that denied a motion for summary judgment grounded in qualified immunity, we may not review rulings based on the district court's determination that genuine disputes exist concerning material facts.[23] In other words, we retain jurisdiction only over those issues that rest on undisputed fact situations, or on which the defendants are willing to accept the plaintiffs' allegations as true.[24] Here, the defendants' contentions regarding the location and visibility of the baton found by Officer Paez conflict with the Gordons' allegations. As a result, this case presents at least one genuine factual dispute that we now analyze to ascertain its materiality vel non to the qualified immunity determination.

As the Gordons argued in their Response to Defendants' Motions

---

[23] Bazan, 246 F.3d at 490 (see supra n.13).

[24] Officer Perez in his appellate brief, maintains that Officer Paez saw the baton in "plain view." Cf. Jones, 132 F.3d at 1052 (finding jurisdiction proper because the defendant asserting qualified immunity accepted the plaintiff's version of the facts for purposes of summary judgment)

for Summary Judgment, there is a considerable dispute whether the baton was visible at all, absent a directed, intrusive, and impermissible search of the car. Officer Paez stated that when he walked near the open driver's-side door, he peered into the pouch located on the inside of the door and saw the baton lying at the bottom of the pouch. According to the recollection of Officer Perez who was standing near the open passenger's-side door, he could see a few inches of one end of the baton protruding from the pouch at an angle.

In direct contradiction to both officers' accounts — which themselves are inconsistent and thus raise a credibility question — Adrian Gordon avers that not only was the baton at the bottom of the pouch, it was covered completely by numerous articles, such as napkins, a tape measure, and bottles of various kinds, which together totally obstructed it from view. He added that the baton had been at the bottom of the ten-inch deep pouch for so long that he had forgotten that it was even in there. Keith Gordon corroborated his father's story, stating that he had never seen the baton before and was not even aware of its presence in the pouch until it was removed by Officer Paez.

In addition to these genuinely disputed material facts, the district court noted Paez's admission that, at the time he looked inside the truck, he did not know (1) who the truck belonged to, (2) if the plaintiffs were lawfully detained, (3) why the plaintiffs were detained, (4) whether the owner of the baton had a

21

permit to carry it, and (5) whether the detained persons had engaged in, or had been alleged to have engaged in, criminal activity. The court also took note of the fact that deposition testimony indicated that Officer Paez, now a reserve officer for the Jourdanton police department, had been fired from the Atacosta County's Sheriff's Department for sleeping while guarding a prisoner.

In Terry v. Ohio, the Supreme Court held that, under limited circumstances, police officers may perform a "stop and frisk" in the absence of a warrant and probable cause.[25] Subsequently, in Mitchell v. Long, the Supreme Court upheld the search of the passenger compartment of an automobile during a traffic stop.[26] The facts and reasoning of Mitchell, however, are easily distinguishable from the facts presented in this case, making that case inapposite. In Mitchell, two police deputies, while on

---

[25] Terry v. Ohio, 392 U.S. 1, 30 (1968):
We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear of his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him (emphasis added).

[26] Mitchell v. Long, 463 U.S. 1032 (1983).

patrol, observed a car that was moving erratically and at excessive speed swerve into a shallow ditch on the side of the road. When the officers approached the driver, he was unresponsive to their questions and requests, and he appeared to be under the influence of drugs or alcohol. Simply looking into the vehicle, the officers saw a hunting knife on the floorboard of the driver's side of the car. Based on these undisputed facts, the officers performed a Terry frisk of the driver's person, and then, to make sure that the driver possessed no other weapons, one officer shined his flashlight into the vehicle and, without entering it, saw something protruding from underneath the armrest on the passenger side. Still searching for other weapons, the officers discovered that the protruding pouch contained marijuana, after which an extended search revealed a large quantity of marijuana in the trunk of the vehicle, for which the driver was tried and convicted.

The Supreme Court in Mitchell rejected the driver's contention that the search exceeded the bounds of a legitimate Terry search, stating that:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.[27]

Further, the Court clarified, "[w]e stress that our decision does

---

[27] Id. at 1049-50 (citations and internal quotations omitted).

23

not mean that the police may conduct automobile searches whenever they conduct an investigative stop ...."[28]

Given the distinguishable facts and circumstances of the instant case, the exigency and justification for the searches in Terry and Mitchell simply do not appertain here. By the time Paez found the baton, other officers had already handcuffed the Gordons and had checked and verified their identifications. The Gordons had cooperated with all of the officers' instructions, had not resisted their restraint, and had truthfully answered all the officers' questions. In short, the summary judgment evidence indicates that the officers had confirmed their misidentification of the Gordons as somehow related to Engleton and had come up with no tangible evidence or indication on which to base further detention of the Gordons.

Furthermore, by the time their investigation had reached this point, the officers no longer had any facts on which to form a reasonable suspicion that the Gordons were a danger to anyone or would pose a danger once they were released from the handcuffs and allowed to proceed. In fact, given the Gordons' confirmed identifications and the other information the officers possessed, there was no basis for a belief that the Gordons would do anything other than peaceably return to their truck and continue their

---

[28] Id. at 1049, n.14.

father-and-son pleasure trip to Ports Mansfield.[29]  Under the totality of these circumstances, the search of the compartments of the vehicle exceeded the legitimate bounds, purposes, and justifications for a Terry/Mitchell search.

Our analysis confirms that the visibility and obviousness of the baton is a fact that is material to the legal analysis of this case. The only version of the facts that could justify Paez's procurement of the baton would be its visibility in plain view, but as we already noted, there exists a genuine factual dispute between the parties as to whether the baton was in plain view.  On summary judgment, we must view the facts in the light most favorable to the non-movant — here, the Gordons.  Given this genuine dispute of material fact, and our requirement of viewing the facts in the light most favorable to the non-movant, we are constrained by our jurisdictional limits to refrain from reviewing the issues related to this genuine and material factual dispute.  The discovery of the baton is used by the defendants in an effort to justify the continued restraint of the Gordons, prompting the full search of the vehicle that in turn uncovered the gun for which Adrian Gordon

---

[29] In response to a question from a member of this panel at oral argument, counsel for some of the defendants attempted to justify the vehicle search under Mitchell's extension of the Terry doctrine on the rationale that the detainees would return to the truck after being released and could then constitute a threat. Under other circumstances that contention might wash, but not here: The officers' error in stopping the Gordons as a result of mistaken identity had already been determined and any Terry or Mitchell justifications debunked before the unconsented to, warrantless search of the vehicle was ever commenced.

was mistakenly arrested, detained, and charged. Under these circumstances, we must dismiss for lack of appellate jurisdiction, Perez's interlocutory appeal of the district court's denial of summary judgment on the Gordons' claims for unconstitutional arrest, search, seizure, malicious prosecution, excessive force, and violation of equal protection and free speech rights.

## D. The 42 U.S.C. §§ 1985 and 1986 Claims

In addition to the § 1983 claims, the Gordons assert claims grounded in §§ 1985 and 1986, for conspiracy to deprive them of their constitutional rights and negligence in preventing the violation of their constitutional rights. The defendants in their briefs argue that, because the Gordons cannot state a viable § 1983 claim, §§ 1985 and 1986 are inapplicable.[30] The district court ruled that because the defendants are not entitled to qualified immunity from the Gordons' § 1983 claims, summary dismissal of the §§ 1985 and 1986 claims would not be proper at this stage. As we agree that at least some of the Gordons' § 1983 claims survive summary judgment, we also agree that their §§ 1985 and 1986 claims remain viable as well. We therefore affirm this aspect of the district court's decision.

## E. State Law Tort Claims and State Law Immunity

Finally, the district court granted in part and denied in part

---

[30] 42 U.S.C. §§ 1985, 1986 (violation of § 1985 premised on the deprivation of a federally-protected right; violation of § 1986 premised on liability for a § 1985 claim).

26

summary judgment on the Gordons' parallel state law tort claims. Under Texas law, a police officer is entitled to "official immunity" from suit when the claims arise from the performance of (1) discretionary duties, (2) performed in good faith, as long as the officer is (3) acting within the scope of his authority.[31] Although the Texas immunity test is articulated differently than the federal test, the Supreme Court of Texas has stated that the Texas test is derived "substantially" from the federal qualified immunity standard.[32] Moreover, under the Texas test, immunity issues are less likely to be resolved at summary judgment than they would be under the federal test.[33] Therefore, to the extent we affirm the district court's order with respect to the federal immunity claims, we also affirm the court's rulings on the parallel state law issues.

---

[31] <u>Cantu v. Rocha</u>, 77 F.3d 795, 808 (5th Cir. 1996).

[32] <u>City of Lancaster v. Chambers</u>, 883 S.W. 2d 650, 656-57 (Tex. 1994).

[33] <u>Id.</u>

## III.  CONCLUSION

We affirm the district court's rulings as to Officers Ortiz, Douglas, Sanchez, Rutherford, Paez, Perez, and Investigator Westfall, but we reverse the court's ruling as to Dispatcher Schawver, who we hold to be entitled to dismissal based on qualified immunity.

AFFIRMED in part; REVERSED in part.